IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

CAL FISHKIN, et al.,            :    CIVIL ACTION
                                :
        v.                      :
                                :
SUSQUEHANNA PARTNERS, G.P.,     :
et al.,                         :
                                :
        v.                      :
                                :
TABFG, LLC, et al.,             :    NO. 03-3766


MEMORANDUM AND ORDER

McLaughlin, J.                                    May 31, 2006

        The Court decides here two motions for summary

judget[1] involving former employees of defendant and

counterclaimant Susquehanna International Group, LLP,[2] who joined

together to form TABFG, LLC ("TABFG"), in partnership with NT

Prop Trading LLC ("NT"), after they left SIG.  SIG and NT have

moved for summary judgment.

        Plaintiffs and counterclaim defendants Cal Fishkin and

Igor Chernomzav included a fraudulent inducement count in their

amended complaint.  They allege that, through statements made by

---

        [1]  Under Fed. R. Civ. P. 56, summary judgment is appropriate
when, viewing the facts and inferences in the light most
favorable to the nonmoving party, there is no genuine issue as to
any material fact and the moving party is entitled to judgment as
a matter of law.


        [2]  Susquehanna International Group, LLP and defendant and
counterclaimant Susquehanna Partners, G.P. are the same entity,
and are known as and hereinafter referred to, collectively, as
"SIG."

a recruiter, SIG fraudulently induced them into accepting employment and executing their employment agreements with SIG. SIG has moved for summary judgment on the fraudulent inducement claim, and the Court will grant the motion on that claim.

This case commenced when Fishkin, Chernomzav, and plaintiff Francis Wisniewski[3] filed an action in state court seeking a declaratory judgment that various post-employment restrictive covenants in their employment agreements with SIG were unenforceable.  SIG counterclaimed against Fishkin and Chernomzav and made a motion for a preliminary injunction upholding the restrictive covenants against all three plaintiffs. The Honorable James McGirr Kelly entered a preliminary injunction on September 17, 2003.  SIG now seeks summary judgment making permanent the preliminary injunctive relief enforcing the restrictive covenants against Fishkin and Chernomzav, and release of the bond that it posted to secure against the wrongful entry of the preliminary injunction.  The Court will grant the motion for summary judgment making permanent the preliminary injunctive relief enforcing the restrictive covenants against Fishkin and Chernomzav, but will not release the bond at this time.

---

[3] Wisniewski is a party to the amended complaint, but is not a party to the fraudulent inducement claim or any of SIG's counterclaims.  Although he was not a party to SIG's counterclaims, he was enjoined under the preliminary injunction that ultimately issued in favor of SIG.  SIG and NT do not seek summary judgment on any claims against him.

NT moves for summary judgment on SIG's claims of tortious interference with contract, misappropriation of trade secrets, civil conspiracy and conversion against it in its amended counterclaim.  These claims relate to NT's role in forming a business relationship with Fishkin and Chernomzav after they left SIG.  The Court will deny NT's motion for summary judgment on these claims.

I.   Procedural History

The three plaintiffs filed their declaratory judgment action in state court.  SIG filed a counterclaim against Fishkin and Chernomzav, and then moved for a preliminary injunction against all three plaintiffs.  SIG then amended its counterclaim to include claims against additional counterclaim defendants TABFG, NT and Richard Pfeil.

NT and Pfeil filed a notice of removal in this Court on June 23, 2003.  On July 7, 2003, NT and Pfeil filed a motion to dismiss.

A preliminary injunction hearing was held from July 8 to July 15, 2003, and the transcripts and exhibits were placed under seal.  A memorandum and order granting the motion for a preliminary injunction was filed under seal on September 17, 2003.  The plaintiffs appealed, and the appeal was dismissed on July 8, 2004.

On March 16, 2005, this case was transferred to this Judge from Judge James McGirr Kelly.  The three plaintiffs filed an amended complaint on March 24, 2005.

On May 2, 2005, the Court granted the motion to dismiss with respect to Pfeil and denied it with respect to NT.  SIG filed a motion for default judgment as to NT on August 25, 2005, which was denied on October 3, 2005.

On February 3, 2006, SIG filed its motion for summary judgment and release of security.  SIG seeks to proceed to trial only on its claims for final relief and disgorgement against the counterclaim defendants.

On April 21, 2006, NT Prop filed its motion for summary judgment.

II.  <u>SIG's Motion</u>

    A.  <u>Facts Relating to SIG's Motion</u>

        1.  <u>Recruitment</u>

SIG is a securities trading firm.  Fishkin and Chernomzav were recruited by SIG out of Haverford and Princeton, respectively, after they applied to be assistant traders at SIG. During the recruitment process, each met with Meera Dhanala Gilbert ("Dhanala"), SIG's head of recruiting.  Dhanala told each of them that if they accepted SIG's offer, they would become assistant traders, and would remain in that position for several

months.  Dhanala explained that when they began working, they
would receive a contract to review.  After several months, if
they were then invited to participate in SIG's training program
for traders, they would be asked to sign the contract.  Dhanala
encouraged them to read the contract, and to have an advisor or
attorney read it.  (SIG Mot. for Summ. Judg. App. ("SIG App.") p.
67, 86, 98-100, 120; Fishkin & Chernomzav Opp. ("F&C Opp.") Ex. B
at 102-03).

Dhanala explained that if SIG decided to invite the
employees into its trading program, it would want to protect its
investment in them through the contract.  The contract contained
a provision prohibiting them from working elsewhere in the
securities or trading industry for three years from the date of
entry into the training program.  Dhanala explained that during
those three years, traders commonly received offers from
competitors for more money.  SIG expected its traders to stay
with SIG despite these offers for three years, and to recognize
that the education and training that they would receive at SIG
would increase their market value at the end of the non-compete
obligation.  Dhanala represented that at the end of the non-
compete, SIG offered the people it chose to retain "competitive"
or "market value" compensation.  Fishkin and Chernomzav claim
that Dhanala characterized this compensation change at the end of
three years as a "new contract."  (SIG App. p. 74, 76, 87, 120;

F&C Opp. Ex. B at 102-03, 149-50, 154-55, 159, Ex. C at 84, 102-08, Ex. D at 24, 27-28, 60, Ex. E).

Both Fishkin and Chernomzav accepted SIG's offer to work as assistant traders, and came to SIG in June of 1999. At some point after they were hired as assistant traders but before they signed their agreements, Fishkin and Chernomzav came to believe based upon conversations with other traders that a 50/50 profit split was the competitive or market value rate for traders. Both employees were offered 50/50 profit splits by competitors after they signed their agreements with SIG. SIG did not offer percentage profit splits. (SIG App. p. 92, 116-18, 133-36; Fishkin Aff. at ¶ 6; Chernomzav Aff. at ¶ 5; F&C Opp. Ex. B at 117, Ex. C at 98, Ex. I).

2. <u>The Contracts</u>

Fishkin signed his contract on March 20, 2000, and Chernomzav signed his on March 30, 2000. The contracts contain no termination date. (SIG App. Item Nos. 11 & 12).

Section 6 of the contracts is entitled "Compensation." It states that "[u]pon completion of the training class . . . Employee shall receive compensation while employed by, and providing services to, [SIG] under this Agreement as follows." It then describes a monthly salary of $4,166.66 "commencing upon the conclusion of the training class," "a discretionary bonus for

6

calendar year ending December 31, 2000" and "discretionary

bonuses for calendar years ending after December 31, 2000."  It

states that "all such discretionary bonuses will be determined by

Susquehanna in its sole discretion," and will not be paid "in the

event Employee's employment is terminated by either party prior

to the award and payment of such bonus by [SIG]."  It further

describes SIG's discretion in determining bonus amounts as

"absolute" and "unfettered."  There is no specific mention of a

profit split after three years in the agreements.  Id.

Section 7 of the contracts is entitled "Termination,"

and allows either SIG or the employees to terminate the agreement

on an at-will basis,

> except that after the termination date the provisions of
> paragraphs 8-21 shall remain in full force and effect.
> Employee acknowledges that it is his or her intention and
> commitment that termination of this Agreement within three
> years of his or her entry into the training course will be
> exercised by him or her only to seek employment or
> opportunity that does not involve Employee in any trading
> activity of any product or any other activity reasonably
> similar to the activities that Employee performs for [SIG]
> and that the restrictions set forth in paragraphs 8-21 below
> are therefore reasonable in light of and consistent with the
> mutual commitments of the parties to this Agreement and in
> light of [SIG]'s legitimate interest in protecting its
> goodwill, trade secrets and other Confidential Information.

Id.

Section 8(a) of the contracts is entitled "Non-

Competition," and states that:

> until the later of the termination of Employee's employment
> by [SIG] and the third anniversary following Employee's
> entry into the training course, Employee shall not . . .

7

> engage in any trading activity of any product or any other activity reasonably similar to activities that Employee performs for [SIG].

Id.

In Section 8(b), entitled "Other Restrictions," the employees agreed that for five years after the termination of their employment, they would not, among other things,

> hire, manage or otherwise have supervisory responsibility over or become associated in any partnership, corporation or other entity with, any person who is, or was at any time during the nine (9) months prior to such hiring, association or exercise of supervisory responsibility, an employee or consultant of [SIG] or a person seconded from [SIG].

Id.

Section 8(c), entitled "Further Restriction," states that:

> [f]or a period of nine (9) months following the later of the termination of your employment or the third anniversary following Employee's entry into the training course, Employee shall not trade in any products in which he or she was trading for [SIG] at any time during the three (3) month period prior to the termination of Employee's employment.

Id.

Section 13 of the contracts, entitled "Confidentiality," prohibits the employees from disclosing confidential information such as trading strategies and techniques, computational techniques, trade secrets and information about the profitability of SIG's products and trades. Id.

Section 21 of the contracts, entitled "Entire

Agreement," states:

> [t]his Agreement contains the entire understanding among the parties with respect to the subject matter hereof, and supersedes all prior and contemporaneous agreements and understanding, inducements of conditions, express or implied, oral or written except as herein contained.  This Agreement may not be modified or amended, other than by an agreement in writing signed by the parties.

<u>Id.</u>

### 3.   <u>Post-Contract Employment and Termination</u>

Fishkin and Chernomzav complied with their three year non-competes and stayed at SIG for three years.  For 2002, Fishkin received a base salary of $80,000 and a bonus of $365,000, and for 2003, his expected base salary was $100,000, and his expected bonus was $300,000-$600,000.  For 2002, Chernomzav received a base salary of $80,000 and a bonus of $85,000.  (SIG App. p. 69, 81, 88).

Chernomzav learned that SIG didn't offer percentage splits in December of 2002, at the end of his third year. Fishkin learned when a non-percentage-based offer was made to him.  The plaintiffs ended their employment agreements in February and March of 2003, began working together as TABFG, and filed this lawsuit.  (F&C Opp. Ex. B at 160-61, Ex. C at 94-95, 111).

4.   Business Interests Served by the Restrictive
     Covenants

_____At the preliminary injunction hearing, SIG presented
evidence of four business interests that the restrictive
covenants in the employment agreements were designed to protect.
First, SIG showed that "its substantial investment of capital and
technology, and in the ongoing training of its traders, is
critical to [its] research and development process which uses
trial and error to identify which products, strategies and
trading methods are profitable for SIG and which traders are best
suited to trade them."  (Inj. Mem. ¶ 36).  SIG established that
Fishkin and Wisniewski took full advantage of the capital and
technology that SIG made available to them.  They also
implemented SIG's trial and error process to maximize the
effectiveness of the trading strategy.  Fishkin was identified as
having the right personality and aptitude to be teamed up with
Wisniewski, and was assigned to team up with him to trade Dow
futures in August of 2001.  The team had substantial capital
available to them, and received the highest priority from SIG's
technology department for trading Dow futures.  They received
special technological enhancements on their equipment to speed up
the implementation of their trading decisions.  These factors
contributed to the profitability of the team.  (Inj. Mem. ¶¶ 35-
50).

        Second, "SIG showed that it had an interest in having

10

the time necessary to enable its replacement of a departing
trader to establish the same good will, trading pit relationships
and effectiveness in trading [products] that the departing trader
had achieved as a result of the opportunity provided by SIG."
(Inj. Mem. ¶ 41).  Fishkin and Chernomzav worked together for 17
months, and during that time, they developed effective social
relationships with brokers who controlled order flow in the
trading pit for the trading of Dow futures.  They learned the
habits of other traders in the pit, which allowed them to
effectively compete with those traders.  They became very
effective at using SIG's trading strategy and tools.  These
skills would benefit any new company if the employees were
allowed to trade Dow futures there.  The new team that came in to
learn these tactics in October of 2002 was not as effective as
Fishkin and Wisniewski's team had been.  Id. at ¶¶ 41-44.

     Third, "SIG has shown an interest in preventing
competitors from taking more than one SIG trader at a time, who,
with the benefit of common analytical methods and a common
language taught to them at SIG, become unfair competition to SIG
when they recreate SIG's information sharing techniques and pool
their knowledge to take unfair advantage of profitable trading
opportunities made available to them as a result of having worked
with SIG."  (Inj. Mem. ¶ 46).  There was evidence that NT
recognized this, and was more interested in funding Fishkin in a

venture if Wisniewski joined him as well.  Fishkin and Wisniewski also recognized this, and asked their former clerk to join them in their new entity.  Although Fishkin had traded Dow futures in the last three months of his employment at SIG, Chernomzav had not.  Chernomzav, however, knew the SIG trading language and approach.  Fishkin taught Chernomzav the strategy for trading Dow futures and essentially made Chernomzav his agent for doing so, in order to circumvent the nine-month/three-month covenant.  <u>Id.</u> at ¶¶ 46-49.

Fourth and finally, "SIG showed an interest in protecting the confidentiality and trade secret nature of the concept underlying its" product trading strategies.  <u>Id.</u> at ¶ 50.

B.   <u>Analysis of SIG's Motion</u>

1.   <u>Fraudulent Inducement Claim</u>

In Count III[4] of the amended complaint, Fishkin and Chernomzav claim that they were fraudulently induced into accepting employment and executing their employment agreements with SIG.  SIG argues that the evidence supporting the fraudulent inducement claim is barred by the parol evidence rule, that the claim itself is barred by the gist of the action doctrine, and that even if the claim were to be considered on its merits, it

---

[4]  In its motion, SIG mistakenly refers to the fraudulent inducement count as Count II.

could not survive summary judgment.[5]  The parties agree that Pennsylvania law applies to the fraudulent inducement claim.

The Court will grant the motion for summary judgment on this claim because it concludes that the parol evidence rule bars its consideration of the evidence supporting the claim.  Given this conclusion, it need not determine whether the gist of the action doctrine would bar the claim.  The Court has serious doubts as to whether, even if it considered the evidence supporting the claim, the claim could survive summary judgment.

a.   Parol Evidence Rule

The parol evidence rule bars the Court's consideration of statements that were allegedly made by a recruiter to Fishkin and Chernomzav before they executed their employment agreements, when the content of the statements was not memorialized in those agreements, and the agreements contained provisions covering the same subject matter.  In HCB Contractors v. Liberty Place Hotel Assocs., 652 A.2d 1278, 1279-80 (Pa. 1995)(discussing Nicolella v. Palmer, 248 A.2d 20 (Pa. 1968)), the Supreme Court of Pennsylvania reaffirmed its prior holding that:

---

[5]  Fishkin and Chernomzav argue that SIG only moved for summary judgment on their claim of fraudulent inducement relating to executing the employment agreements, and not on their claim of fraudulent inducement relating to their acceptance of employment. The motion was made as to the entire fraudulent inducement count of the amended complaint, and the Court will consider it as to both elements of the claim.

> where prior fraudulent oral representations are alleged
> regarding a subject that was specifically dealt with in the
> written contract, the party alleging such representations
> must, under the parol evidence rule, also aver that the
> representations were fraudulently or by accident or mistake
> omitted from the integrated written contract.

The court quoted language upon which it had relied in Nicolella
that explained the consequence of allowing the allegation that
oral representations were fraudulently made to suffice to make
testimony about them admissible without the allegation that the
representations were omitted from the written contract
fraudulently or by accident or mistake.  Id. at 1279.  "[T]he
parol evidence rule would become a mockery, because all a party
to the written contract would have to do to avoid, modify or
nullify it would be to aver (and prove) that the false
representations were fraudulently made."  Id. (citations
omitted).

        In Dayhoff Inc. v. H.J. Heinz Co., 86 F.3d 1287, 1300
(3d Cir. 1996), the United States Court of Appeals for the Third
Circuit agreed that this situation would render the parol
evidence rule a mockery, "and integrated contracts could be
avoided or modified by claims of differing prior
representations."

        The only real issue, then, is whether the employment
agreements cover the topic of the type of compensation through
which any "competitive" or "market value" compensation would be
effectuated after the expiration of the three year non-

14

competition provision.  "The parol evidence rule is not applicable if the parties did not intend a written contract to set forth their full agreement."  Mellon Bank Corp. v. First Union Real Estate Equity & Mortgage Invs., 951 F.2d 1399, 1405 (3d Cir. 1991).

To determine what the parties intended, the Court must inquire:

> whether the parties, situated as were the ones to the contract, would naturally and normally include the [oral agreement] in the [written one] if it were made.  If they relate to the same subject matter, and are so interrelated that both would be executed at the same time and in the same contract, the scope of the subsidiary agreement must be taken to be covered by the writing.

Id.

In Pilallis v. Electronic Data Sys. Corp., 1998 U.S. Dist. LEXIS 5934 at *8-*9 (E.D. Pa. Apr. 28, 1998), the court found that oral agreements about post-employment commission payments were admissible in the face of a contract that dealt with a monthly salary, but did not deal with commissions either during or post-employment.

The presence of an integration clause supports the application of the parol evidence rule.  HCB Contractors, 652 A.2d at 1280.

In this case, the agreements did not terminate after three years.  They set out the compensation to be paid "for the calendar year ending December 31, 2000," and "for calendar years

ending after December 31, 2000," with no indication of a termination date.  (SIG App. Item Nos. 11 & 12).  The compensation included both a base salary and a discretionary bonus.  Id.  The discretionary bonus provision is not inconsistent with a competitive or market value compensation package, or a profit-sharing package, yet there is no mention of such a package in the agreements, even in the section discussing bonuses "for calendar years ending after December 31, 2000."  Id.

Given that the contracts cover compensation for the entire employment relationship of the employees and SIG, they would naturally and normally include the topic of compensation after the expiration of the non-compete.  Whether or not the plaintiffs, college graduates recruited into high-paying financial jobs, were sophisticated enough to understand the agreements, they were given copies of the employment agreements when they were hired in June of 1999, and had until March of 2000 to review them themselves or with an advisor or attorney.  They did not negotiate for a provision requiring competitive or market value compensation, or profit-sharing, after three years.[6]

This case is distinguishable from Pilallis.  In Pilallis, the commission payments were a separate form of

---

[6]  Whether or not the plaintiffs negotiated when they actually signed the agreements, there is no evidence that they were prevented from doing so.  It is undisputed that they discussed the agreements with Dhanala during the recruitment process.

compensation from the monthly salary mentioned in the contracts. Here, Fishkin and Chernomzav do not dispute that the competitive or market value compensation that they allege they were promised could have been made within the gambit of the discretionary bonus provisions of the employment agreements. Even if competitive or market value compensation would be based upon the amount of profits generated by an employee, that amount could be integrated into that employee's bonus.

Other aspects of the contract are also relevant to this analysis. According to Fishkin and Chernomzav themselves, the alleged competitive or market value compensation would come at the end of the non-competition obligation. It is thus related to the non-competition provision, yet that provision does not mention it. (SIG App. Item Nos. 11 & 12). In addition, there is an integration clause, indicating that the topic of compensation is completely covered by the agreement. Id.

The plaintiffs argue that the promise of competitive or market value compensation after three years was a major factor that influenced them to accept employment with SIG. If that is true, it is difficult to understand why they would not have insisted that a provision memorializing that promise be included in contracts that covered compensation and non-competition and that had no expiration dates.

b.   <u>Gist of the Action Doctrine</u>

_____   SIG also argues that the gist of the action doctrine bars the fraudulent inducement claim because that claim is essentially a contract claim.  Because the Court has already determined that the evidence supporting the fraudulent inducement claim is barred by the parol evidence rule, it need not determine whether the gist of the action doctrine would bar the claim.

c.   <u>Fraud Claim Would Fail</u>

The Court has serious doubts as to whether Fishkin and Chernomzav's fraudulent inducement claim could survive summary judgment, even if the evidence supporting the claim were not barred by the parol evidence rule.  "Fraud is the misrepresentation of a material fact on which the other party relies to his injury.  The breach of a promise to do something in the future is not fraud." <u>Edelstein v. Carole House Apartments, Inc.</u>, 286 A.2d 658, 661 (Pa. Super. 1971)(citing <u>Cooper v. Gasteiger</u>, 123 A. 500 (Pa. 1924) and <u>First Nat'l Bank v. Sagerson</u>, 129 A. 333 (Pa. 1925)).

> Pennsylvania law . . . requires that to be actionable a
> misrepresentation must be of fact rather than merely of
> opinion.  A [defendant] may 'puff' or give subjective
> opinions . . . without making a material misrepresentation
> if the representations necessarily involve individual
> judgement such that, even though made absolutely, the hearer
> must know that they can be based only on the speaker's
> opinion.

<u>Step-Saver Data Sys., Inc. v. Wyse Tech.</u>, 752 F. Supp. 181, 190

18

(E.D. Pa. 1990)(citation omitted).  "Fraud must be proved by clear, precise, and indubitable evidence."  <u>Edelstein</u>, 286 A.2d at 661.

This case involved a promise to do something in the future, and therefore did not involve fraud.  Fishkin and Chernomzav attempt to characterize the alleged representation of competitive or market value compensation as a representation of a "practice" of SIG's, in order to avoid this problem.  This argument is weak.

In addition, SIG's promise to pay "competitive" or "market value" compensation necessarily involved its subjective opinion as to what that amount would be.  Those terms have no fixed definition.  The fact that third parties may have led the plaintiffs to believe that "competitive" or "market value" compensation had a specific meaning does not show that SIG intended to use that meaning.  Indeed, the plaintiffs have admitted that at the time they accepted employment, they themselves were not aware of that meaning.  If, as they describe, they became aware of it before they signed their agreements, and if it was important to them, that should have further motivated them to insist that it be included in the agreements.

In this case, the alleged promise was also contingent upon SIG deciding that it wanted to retain a particular employee.  It had no obligation to do so during the initial assistant trader

period, or during or at the expiration of the non-compete.

The evidence of fraud in this case is based upon a vague, subjective and conditional promise that was not included in a subsequent written agreement covering the topic under which it would logically fall.  It is not clear, precise, or indubitable.  Even if the evidence were not barred by the parol evidence rule, it could not support a claim of fraudulent inducement.

    2.   Final Injunctive Relief Enforcing Restrictive
         Covenants and Release of Security

SIG seeks summary judgment on its claim for final injunctive relief enforcing two restrictive covenants that were enforced against Fishkin and Chernomzav through paragraph 1 of the preliminary injunction on September 17, 2003.  It also seeks release of the bond that it posted to secure against the wrongful entry of the preliminary injunction.  Fishkin and Chernomzav argue that genuine disputes of material fact remain relating to the restrictive covenants enforced under the preliminary injunction, and that the issue should proceed towards trial.  The Court will grant the motion on the claim for final injunctive relief enforcing the restrictive covenants against Fishkin and Chernomzav, but will not release the bond at this time.[7]

_____

    [7]   The restrictive covenants upon which SIG's motion is based were temporally limited, and the parties agree that the time periods have expired.  In a sense, then, the Court's

20

        a.   Final Injunctive Relief on Restrictive
             Covenants

        The restrictive covenants were contained in two

provisions of the employment agreements.  In the "nine-

month/three-month" clause in Section 8(c), the employees agreed

that for nine months after the later of the termination of their

employment or the expiration of the three year non-compete, they

would not trade any products that they traded for SIG during the

three months prior to the termination of employment.  In the

"non-association clause" in Section 8(b), the employees agreed to

refrain for five years after the termination of their employment

from associating with any person who was at that time or at any

time during the nine months prior to such association, an

employee of SIG.[8]

        The grant of the preliminary injunction was based upon

SIG's showing that: (1) it had a reasonable probability of

_____

granting of final injunctive relief on the covenants is moot;
however, the parties agree that the Court should decide the
issue.  The Court's decision will have an effect on SIG's ability
to recover the bond that it posted to secure against the wrongful
entry of the preliminary injunction.  Such release will depend
upon SIG's showing at trial that the other bases for the
preliminary injunction were also valid, as discussed below.

        [8]  Judge Kelly shortened the non-association restrictive
covenant to three years from the date of the termination of
employment.  (Mem. of 9/17/03 at 38-40).  He noted that SIG
enforces its non-compete for three years on the rationale that
"the period is reasonably necessary for it to protect its
investment in specialized training."  Id.  He reasoned that
"[l]ikewise, . . . a period of three years is reasonably
necessary for SIG to protect its legitimate business interests
from unfair competition by its former employees."  Id.

success on the merits; (2) it would be irreparably injured by a denial of relief; (3) granting the preliminary relief would not result in even greater harm to the nonmoving party; and (4) granting the preliminary relief would be in the public interest. Allegheny Energy, Inc. v. DQE, Inc., 171 F.3d 153, 158 (3d Cir. 1999).  The standard for granting a permanent injunction is the same, except that under the first prong, the moving party must show actual success on the merits, rather than a reasonable probability thereof.  Shields v. Zuccarini, 254 F.3d 476, 482 (3d Cir. 2001).

(1)   Actual Success on the Merits

To determine whether SIG has shown actual success on the merits, the Court must determine whether the restrictive covenants are enforceable under Pennsylvania law.  Prison Health Servs., Inc. v. Umar, 2002 U.S. Dist. LEXIS 12288 at *32 (E.D. Pa. Jul. 3, 2002).  Non-compete covenants are enforceable in Pennsylvania if they are: (1) ancillary to the employment relationship; (2) supported by adequate consideration; (3) reasonably limited in time and geographic scope; and (4) reasonably designed to safeguard a legitimate interest of the former employer."  Gagliardi Bros. v. Caputo, 538 F. Supp. 525, 527 (E.D. Pa. 1982); Hess v. Gebhard & Co., 808 A.2d 912, 917 (Pa. 2002).  Fishkin and Chernomzav bear the burden of proving

22

that the restrictive covenants are unreasonable.  Admiral Servs., Inc. v. Drebit, 1995 U.S. Dist. LEXIS 3897 at *15 (E.D. Pa. Mar. 28, 1995); John G. Bryant Co. v. Sling Testing & Repair, Inc., 369 A.2d 1164, 1169 (Pa. 1977).

"Pennsylvania cases have recognized that trade secrets of an employer, customer goodwill and specialized training and skills acquired from an employer are all legitimate interests protectible through a general restrictive covenant."  Thermo-Guard, Inc. v. Cochran, 596 A.2d 188, 193-94 (Pa. Super. 1991).

(a)   The Nine-Month/Three Month Provision

As to the nine-month/three-month provision, Fishkin and Chernomzav do not argue that genuine disputes of material fact remain relating to the first three prongs of the restrictive covenant enforceability test.  The remaining issue is whether any genuine dispute of material fact remains relating to whether the restrictive covenant is reasonably designed to safeguard a legitimate interest of SIG's.  The Court finds that no genuine dispute of material fact remains on this issue.

SIG concedes that genuine disputes of material fact remain with respect to its fourth interest, relating to its confidential information and trade secrets.  It argues, however, that there is no genuine dispute of material fact that the first and second interests independently support the enforceability of

the nine-month/three-month clause.

There is no genuine dispute of material fact that as
Judge Kelly noted, Fishkin took full advantage of SIG's capital,
technology, and trial and error process to learn how to best use
the trading strategy.  (Inj. Mem. at ¶¶ 37, 39).  Fishkin also
benefitted from SIG's identification of the team in which he
could most effectively work.  Id. at ¶ 40.  Once SIG invests in
providing an employee with these opportunities, it is entitled to
a buffer period before that employee can use that knowledge to
compete with it.  The nine-month/three-month clause imposes a
reasonable waiting period.

In addition, there is no genuine dispute of material
fact that SIG was entitled to have a limited amount of time to
enable replacements to establish the same relationships, goodwill
and effectiveness that the former SIG employee would be able to
use to compete with SIG only because of the opportunities
provided to him by SIG.  Judge Kelly noted that there was ample
evidence that traders developed goodwill with brokers[9] and
learned about the trading habits of other traders, with whom they
had to compete.  Id. at ¶ 42.  This goodwill and knowledge was
valuable to the employees, and working at SIG allowed them to
gain it.  Id.  In addition, it takes time for replacements to
master the trading strategy and to become an effective team.  Id.

---

[9]  Broker goodwill, like customer goodwill, is a legitimate
business interest in this context.

at ¶¶ 44-45.

Contrary to what Fishkin and Chernomzav argue, the issues that they discuss in their opposition do not constitute genuine disputes of material fact as to whether the two above interests independently support the enforceability of the restrictive covenants.  For example, the fact that similar interests may be protected during employment through the three-year non-compete does not render this limited, post-employment non-compete unenforceable.  It is undisputed that the two covenants covered different time periods.  In addition, whether or not an employee was profitable for SIG is not relevant to whether SIG invested significantly in tools that allowed for that profitability.  Even if Fishkin was profitable from his first day of work for SIG, there is no genuine dispute of material fact that he was even more profitable as he became more experienced, and that it would take a new employee time to duplicate this experience.

It is not necessary for SIG to show exactly how the traders used their knowledge in their new endeavor.  The non-compete is enforceable because the traders would necessarily use this knowledge in trading on their own, as they had at SIG, in competition with SIG.  SIG had a legitimate interest that it was entitled to protect for a limited amount of time.  It is undisputed that at least some of the traders' trades in their new

endeavor competed both directly and indirectly with SIG.  <u>Id.</u> at 82.

Fishkin and Chernomzav argue that Chernomzav did not trade the Dow futures at SIG.  As Judge Kelly noted, however, Fishkin taught him the strategy for trading this product, and "essentially made [him] his agent for doing so."  <u>Id.</u> at ¶ 49. The injunction was proper against Chernomzav, because Fishkin could not circumvent the restriction by directing an agent to do what he himself was prohibited from doing.  <u>Id.</u> at ¶¶ 19-20. There is no genuine dispute of material fact that the nine-month/three-month clause is enforceable.

### (b)   <u>The Non-Association Clause</u>

Fishkin and Chernomzav's arguments regarding the non-association clause are also unpersuasive.  These arguments relate to both the breadth of the covenant and the business interests supporting it.

Fishkin and Chernomzav argue that the non-association clause is overbroad because it has no geographic limitations. They argue that it could prevent them from associating in any way with another former SIG employee at any location.  The non-association clause was temporally limited, and Judge Kelly limited its duration even further.  Still, it is true that in isolation, the non-association clause appears broad in some ways.

26

Taking the contract as a whole, however, this clause can be interpreted in light of the other clauses of the contract, which illustrate that SIG's concern was for its employees engaging "in any trading activity of any product or any other activity reasonably similar to the activities that Employee performs for [SIG]." (SIG App. Item Nos. 11 & 12, § 7). In fact, this sentence goes on to state that "paragraphs 8-21," which include the non-association clause, "below are therefore reasonable." Id. Thus, it is because of SIG's concern about its employees performing activities similar to those they performed at SIG that SIG included the non-compete clauses. The non-association clause can be construed narrowly to apply only to associations to perform activities reasonably similar to those performed at SIG, in light of the limited purpose behind it.

Construed so narrowly, Fishkin and Chernomzav's activities still fall squarely within the prohibitions of the non-association clause. This was not a situation where former SIG employees coincidentally ended up at the same other large company, working separately. Rather, they formed their own small company, immediately upon leaving SIG, to trade the exact products that Fishkin had traded for SIG, in competition with SIG. They attempted to circumvent the nine-month/three-month clause, and the non-association clause operated to prevent such circumvention. Given this narrow reading, the non-association

clause is reasonable and prohibits the conduct in which Fishkin and Chernomzav engaged.

There is no genuine dispute of material fact that the third business interest supports the enforceability of the non-association clause.  As Judge Kelly recognized, without the non-association clause, traders who, like Fishkin and Chernomzav, traded different products at SIG, could team up to circumvent the purpose of the nine-month/three-month restrictive covenant.  (Inj. Mem. at ¶ 49).  Fishkin and Chernomzav do not dispute this fact.  As Judge Kelly noted, traders leaving SIG would have "a trading language and approach to risk, profit and expectancy that is synchronized," regardless of whether they traded the same product at SIG.  Id.  In this case, Fishkin could use this common experience to easily teach Chernomzav to trade Dow futures, which he himself was prohibited from doing, to circumvent the nine-month/three-month clause.

Fishkin and Chernomzav argue that the shared language and approach do not constitute trade secrets.  This dispute does not bar the granting of summary judgment.  In fact, SIG has conceded that genuine disputes of material fact remain on the trade secret justification for the restrictive covenants.  Summary judgment is nevertheless appropriate because the other business interests independently support the enforceability of the covenants.

SIG has established that there is no genuine dispute of material fact that the restrictive covenants, as modified by the preliminary injunction, are enforceable.  SIG has therefore established actual success on the merits of its claim for permanent injunctive relief enforcing the restrictive covenants against Fishkin and Chernomzav.

> (2)  Irreparable Harm, Balance of Hardships, and Public Interest

The other factors relevant to the analysis of a request for an injunction also weigh in favor of SIG.  Although Judge Kelly's finding of irreparable harm was based in part upon the potential harm to SIG's confidential information and trade secrets, it was also based upon potential harm to SIG's goodwill. Id. at ¶ 27.  It is difficult to quantify the exact amount of harm that SIG would incur from having its employees associate to trade the products that SIG gave them the opportunity and resources to trade profitably the day after they left SIG.  SIG has shown, however, some amount of irreparable harm justifying limited restrictive covenants.  Having found that the restrictive covenants are enforceable, it follows that they were appropriately enforced in the face of any detriment that they caused to Fishkin and Chernomzav.  In addition, limited restrictive covenants protecting legitimate business interests are in the public interest.

29

b.   <u>Release of the Bond</u>

The Court will not release the bond at this time.  The bond was based upon an injunction that enjoined all three plaintiffs from violating the restrictive covenants and enjoined Fishkin and Chernomzav from disclosing or using SIG's confidential information.  SIG moved for summary judgment making permanent paragraph 1 of the injunction, which enforced the restrictive covenants against Fishkin and Chernomzav.  It did not, however, move for summary judgment making permanent paragraphs 2 or 3 of the preliminary injunction.  Paragraph 2 enjoined Fishkin and Chernomzav from disclosing or using SIG's confidential information.  Paragraph 3 enjoined Wisniewski from violating the restrictive covenants.  There remains the possibility that these two paragraphs of the injunction were wrongfully issued.  If so, the Court will need to consider what portion of the bond, if any, should be released.  Thus, the Court will defer its decision on the bond until it is clear whether all, some, or none of the bond can be released.

III. <u>NT's Motion</u>

A.   <u>Additional Facts Relating to NT's Motion</u>

In December of 2002, a trader named John Zawalski approached Fishkin to ask if he was happy with SIG.  Fishkin said that he was not, and Zawalski said that he was attempting to

organize a group to trade Dow Futures on behalf of NT.  He asked
if Fishkin wanted to help form that group.  (NT Mot. Summ. Judg.
App. ("NT App.") p. 188-89).

In late January or February of 2003, Fishkin and
Wisniewski had dinner with Zawalski, Larry Nocek, and Bob O'Byrne
of NT to discuss a possible new venture.  At that meeting,
Fishkin explained that he and Wisniewski were still under
contract with SIG, and that he could begin working for the new
group in March of 2003, when his contract ended.  He said that
"there are these restrictive covenants in my contract [and] that
it's going to take some legal fees.  We're going to have to hire
some attorneys to deal with that."  He explained that Wisniewski
had just re-signed a contract including covenants, "[s]o it will
be even more fees to deal with him. . . . And we said, you know,
you understand that we're going to want you to help us beat those
costs when the time comes if we are to agree to work with you."
The response to this was "Yes, we understand."  (NT App. p. 134).

In meetings in late 2002 and early 2003, Nocek asked
Fishkin how much money he had made trading Dow Futures for SIG.
Fishkin explained that he and Wisniewski "looked at each other
and shrugged because we didn't want to convey confidential
information from Susquehanna [and] said '[w]ell, we can't tell
you.'"  Nocek pressed, and Fishkin and Wisniewski said, "Don't
worry.  You'll be pleased."  (NT App. p. 121).

By February of 2003, Fishkin "had a pretty good idea that [he] was quitting Susquehanna, and [he] wanted to have the new deal and the new terms already worked out as soon as [he] quit."  Before he left SIG, Fishkin approached Chernomzav, his close friend, about working together after they left SIG.  (NT App. p. 123, 127).

After Fishkin had quit his job at SIG, representatives of NT asked him to fill out a questionnaire.  In response to the question of whether coming to NT would require Fishkin to violate any non-competes or intellectual property agreements, Fishkin wrote in a dash.  The questionnaire also asked Fishkin to describe his and Wisniewski's trading strategy in detail. Fishkin gave intentionally vague responses, followed by more detailed responses in a separate document entitled "Trading Strategy Requiring Margin Financing."  (NT App. p. 108-09; SIG Resp. Exs. A-C).

In Fishkin's estimation, he was able to be more successful working in a team with Wisniewski than he would have been alone, and NT wanted to hire them as a team.  Wisniewski did not, however, ultimately join the new venture.  (NT App. p. 127, 136).

Fishkin left his employment with SIG on March 20, 2003. Chernomzav left on March 30, 2003.  On March 31, 2003, Fishkin and Chernomzav formed TABFG, a limited liability company.

32

Fishkin was a majority interest member and Chernomzav and Kent Spellman were the other members.  All three were employees of TABFG.  (NT App. p. 42, 75, 93, 144-46, 151, 188).

In early April of 2003, Nocek approached Pfeil to seek his investment in a new venture with traders looking for seed money for their business.  On April 11, 2003, Nocek and Pfeil's attorney, William Anthony, became the two managers of NT.  (NT App. p. 203, 222).

On April 23, 2003, Fishkin, Chernomzav and Spellman, on behalf of TABFG, and Anthony, on behalf of NT, each signed a written agreement called "Joint Venture Term Sheet" ("the JVTS"), which set out the terms of the new relationship between TABFG and NT.  It stated that TABFG was responsible for trading, using the judgment of its principals, and its own confidential proprietary systems and software.  It stated that TABFG would retain its software, systems, codes and trading techniques as its sole and exclusive proprietary property and trade secrets, which it would not disclose to NT and in which NT would not acquire any rights.  (NT App. p. 240-46).

The JVTS stated that NT would receive 50% of the net trading profits in exchange for committing to invest up to $4.5 million.  NT agreed to share with TABFG "the costs incurred by TABFG and/or its principals in connection with termination of their previous employment relationship."  It specified the

sharing of attorney's fees up to $250,000.  (NT App. p. 240-46).

NT eventually paid $2 million to finance the trading of Dow Futures for the joint venture's benefit.  It paid litigation fees incurred by the former SIG employees of at least $150,000. (NT App. p. 203, 224).

B.  Analysis

1.  Tortious Interference

SIG claims that NT tortiously interfered with its employment agreements with Fishkin and Chernomzav.  NT argues that it is entitled to summary judgment on this claim.  The Court disagrees.

"The Pennsylvania Supreme Court has explicitly adopted § 766 of the Restatement (Second) of Torts" on claims of tortious interference.  Windsor Secs., Inc. v. Hartford Life Ins. Co., 986 F.2d 655, 659 (3d Cir. 1993)(citing Adler, Barish, Daniels, Levin & Creskoff v. Epstein, 393 A.2d 1175, 1183 (Pa. 1978)).  Section 766 provides that:

> One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the third person's failure to perform the contract.

Restatement (Second) of Torts § 766.

A party making a claim of this sort must prove that (1)

34

there is an existing contractual relationship between the plaintiff and a third party; (2) the defendant purposely or intentionally interfered with the performance of that contract by inducing a breach or otherwise causing the third party not to perform; (3) the defendant was not privileged to act in this manner; and (4) the plaintiff suffered pecuniary loss as a result of the breach of contract. Remick v. Manfredy, 238 F.3d 248, 263 (3d Cir. 2001); A.D.E. Food Servs. Corp. v. City of Philadelphia, 1997 U.S. Dist. LEXIS 15753 at *34 (E.D. Pa. Oct. 9, 1997); Al Hamilton Contracting Co. v. Cowder, 644 A.2d 188, 191 (Pa. Super. 1994).

NT argues that it would have been impossible for NT to cause the traders to breach the employment agreements because they breached the agreements on March 31, 2003, several weeks before the JVTS was signed.  The JVTS did not, however, come into being spontaneously.  While the employees were still working for SIG, NT contacted Fishkin.  NT learned that the SIG employees had restrictive covenants with SIG which would have to be dealt with in order for them to trade for NT.  NT agreed to finance litigation to try to declare the covenants unenforceable.  NT agreed to finance the traders' trading as a team.  Thus, NT's actions did not begin on the date of the agreements; rather, they began well before that date, when the traders were still working for SIG.  Given that NT agreed to finance the venture and the

litigation, genuine disputes of material fact remain on whether NT caused, enabled, induced and effectuated the traders' breach of their restrictive covenants.

NT argues that it never knew the precise terms of the employment agreements, and that in fact the employment agreements themselves prohibited the traders from disclosing their terms. It is clear, however, that NT knew that restrictive covenants that would have to be litigated existed, because Fishkin and Wisniewski explained that fact to NT's representatives.  NT's willingness to finance such litigation provides the requisite evidence of an intent to interfere for the claim against NT to survive summary judgment.  Genuine disputes of material fact remain on the tortious interference claim.

### 2.   Misappropriation of Trade Secrets

NT also moves for summary judgment on SIG's claims of misappropriation of trade secrets.  The Court will deny the motion on this claim as well.

To prevail on a claim of misappropriation of trade secrets against NT, SIG must prove: (1) the existence of a trade secret; (2) communicated in confidence to NT; (3) use of the trade secret by NT in breach of that confidence; and (4) use by NT to the detriment of SIG.  GE Capital Mortgage Servs., Inc. v. Pinnacle Mortgage Investment Corp., 897 F. Supp. 854, 870 (E.D.

Pa. 1995).

NT does not appear to dispute that trade secrets existed; rather, it argues that they were never communicated to NT, and that NT never used them.  It appears, however, that in response to questions and pressure from representatives of NT, Fishkin communicated allegedly confidential information about SIG's trading strategies to NT.  (NT App. p. 108-09; SIG Resp. Exs. A-C).  When Fishkin gave "intentionally vague" responses, NT had him fill out another sheet with more detailed responses.  Id. Regardless of what the JVTS indicated, then, there is a genuine dispute of material fact as to whether NT gleaned confidential information from Fishkin.  NT benefitted from the alleged secrets in collecting 50% of the profits of the joint venture.  Genuine disputes of material fact remain on the claim of misappropriation of trade secrets.

### 3.  Civil Conspiracy

SIG claims that NT engaged in a civil conspiracy in agreeing to violate the restrictive covenants and the confidentiality provision of the traders' employment agreements. The elements of civil conspiracy are (1) a combination of two or more persons acting with a common purpose to do an unlawful act or to do a lawful act by unlawful means or for an unlawful purpose; (2) an overt act done in pursuance of the common

purpose; and (3) actual legal damage.  <u>Doltz v. Harris & Assocs.</u>, 280 F. Supp. 2d 377, 389 (E.D. Pa. 2003).

For the same reasons supporting the Court's denial of the motion on the substantive claims, the Court will deny the motion on the conspiracy claim.


4.   <u>Conversion</u>

Finally, SIG alleges in Count III of the Amended Counterclaim that NT's continued possession and/or use of SIG's confidential information and property constitutes conversion. Genuine disputes of material fact also remain on the conversion claim.

Under Pennsylvania law, trade secrets can be the objects of conversion.  <u>Schmidt, Long & Assoc., Inc. v. Aetna U.S. Healthcare, Inc.</u>, 2001 U.S. Dist. LEXIS 10709 at *26 (E.D. Pa. July 26, 2001).  To prevail on the conversion claim, SIG must prove that (1) it owns the trade secret; (2) the trade secret was communicated to NT within a confidential relationship; and (3) NT used the trade secret to SIG's detriment.  <u>Id.</u> at 27.

These are essentially the same elements that are required to prove the misappropriation claim.  The Court will deny the motion on this claim as well.

38

```
                IN THE UNITED STATES DISTRICT COURT
              FOR THE EASTERN DISTRICT OF PENNSYLVANIA

CAL FISHKIN, et al.,          :    CIVIL ACTION
                              :
        v.                    :
                              :
SUSQUEHANNA PARTNERS, G.P.,   :
et al.,                       :
                              :
        v.                    :
                              :
TABFG, LLC, et al.,           :    NO. 03-3766
```

<u>ORDER</u>

AND NOW, this 31st day of May, 2006, upon consideration of the Motion of Defendant and Counterclaimant Susquehanna International Group, LLP ("SIG") for Summary Judgment and Release of Security (Docket No. 112), the response and reply thereto, the Motion of Counterclaim-Defendant, NT Prop Trading LLC ("NT"), for Summary Judgment (Docket No. 122), and the response and reply thereto, and after oral argument on the motions on May 12, 2006, IT IS HEREBY ORDERED that, for the reasons stated in a memorandum of today's date:

1.    SIG's motion for summary judgment is GRANTED; however, the bond will not be released at this time.

2.    NT's motion for summary judgment is DENIED.


                              BY THE COURT:

                              /s/ Mary A. McLaughlin
                              MARY A. McLAUGHLIN, J.